In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1735

LATIF KHAN,

*Plaintiff-Appellant,*

*v.*

EDWARD BLAND, HOUSING AUTHORITY OF
CHAMPAIGN COUNTY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 C 2234—**Michael P. McCuskey**, *Chief Judge.*

SUBMITTED SEPTEMBER 13, 2010[*]—DECIDED DECEMBER 23, 2010

Before EASTERBROOK, *Chief Judge,* and POSNER and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Latif Khan is a landlord in Champaign, Illinois, who began renting properties under the Section 8 Housing Choice Voucher Program in 1993

---

[*] The parties stipulated to waive oral argument.

through the Housing Authority of Champaign County (HACC). Khan's relationship with the HACC began to deteriorate in 2005 when Khan evicted a Section 8 tenant from one of his units and Edward Bland, the executive director of HACC, became aware that Khan had entered into a side lease with the tenant for the basement of the unit. Bland believed the side lease was a violation of Khan's Section 8 Housing Assistance Payment (HAP) contract and a violation of U.S. Department of Housing and Urban Development (HUD) regulations. At a meeting with Khan and his attorney, Bland informed Khan that he was going to terminate all of Khan's existing HAP contracts and debar him from doing business with HACC's Section 8 program in the future because of the violation. Bland refused to consider Khan's explanation of the side lease. A subsequent meeting between Bland and Khan's attorney had the same outcome. At the time, Khan had four HAP contracts; HACC terminated two of those contracts, but allowed two to continue. Khan was later informed by a prospective Section 8 tenant that Pam Presley, HACC Section 8 Coordinator, told her that Khan was an "undesired person," that he was not good to rent from, and that she could not rent from him.

Kahn brought suit against Bland, HACC Section 8 Manager Tosha LeShure, HACC, and Secretary of HUD Alphonso Jackson (who is not a party this appeal) for violation of his substantive and procedural due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. He contends that Defendants-Appellees Bland and HACC wrongfully terminated his existing

HAP contracts and debarred him from the Section 8 program without due process. Although LeShure is a named party on appeal, Khan has not appealed the district court's ruling dismissing her from the lawsuit.

Khan presented evidence of his claims (some of which are not at issue here) to a jury, and at the close of his case, the appellees moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The district court granted the appellees' motion, finding that Khan had no property right in the renewal of his HAP contracts or future contracts and at most, had a state law breach of contract claim for the termination of his existing contracts. Khan declined the court's invitation to amend his complaint to assert a breach of contract action. Khan appeals, contending that the district court erred in granting judgment as a matter of law.

We affirm. Khan does not have a property right in his expectancy to enter into new contracts under the Section 8 program. He has not pointed to any provision of the HAP contract, federal law, or state law that would entitle him to continued participation in the program, and the relevant regulations state that owners/landlords are not entitled to continued participation. While he may have property rights in his existing HAP contracts and extensions of those contracts, he was afforded all the process that was due by his available post-deprivation remedy of a state law breach of contract action. Because Khan was not denied a present entitlement, the due process clause does not require a pre-deprivation hearing to interpret the terms of the HAP contracts and incorporated federal regulations.

Further, although Khan argues that he has a liberty interest at stake, he has forfeited this argument by failing to raise it below. Even if we assume that Khan preserved this line of argument and accept his contention that Presley's allegedly defamatory statements were directed by Bland, Khan cannot meet the stigma-plus test set forth in *Paul v. Davis*, 424 U.S. 693 (1976), because he has not shown an alteration of his legal status—the "plus" prong of the test. In accordance with this court's holding in *Medley v. City of Milwaukee*, 969 F.2d 312 (7th Cir. 1992), Khan has no liberty interest in participating in the Section 8 program—a government assistance program designed to provide benefits to third party participants.

Finally, Khan cannot make out a substantive due process claim for his property interest in existing contracts. A mere breach of contract does not support a substantive due process claim. Khan cannot show that a fundamental right was implicated by the alleged breach, nor can he show that appellees violated some other substantive constitutional right or that state law remedies were inadequate to redress the alleged violation.

## I.

Khan asserted seven counts in his complaint; the only counts at issue in this appeal are Counts I (procedural due process claim against Bland), III (substantive due process claim against Bland), and VI (due process claim against the HACC). More specifically, in Count I, Khan alleged that Bland, as executive director

of the HACC, deprived him of valuable property rights, i.e., his contracts with the HACC and his expectancy to continue to contract in the future, without due process of law. In Count III, Khan alleged that Bland debarred him from doing business with the HACC and that Bland's actions were done arbitrarily and capriciously, with malice in retaliation against Khan for evicting a tenant who had violated his lease. In Count VI, Khan alleged that Bland was in a position to make and enforce policies on behalf of the HACC and that his actions in terminating Khan's contracts with the HACC without due process were the actions of HACC.

This court reviews de novo the district court's grant of a motion for judgment as a matter of law. *Greene v. Potter*, 557 F.3d 765, 767 (7th Cir. 2009). Rule 50 authorizes the entry of judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "In other words, the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008).

### A.  The Section 8 Housing Choice Voucher Program

Before exploring the details of this case, we begin by discussing some general aspects of the federal housing subsidy program. The Section 8 Housing Choice Voucher Program provides rental assistance to low-income families

to enable them to participate in the private rental market. This program is administered by HUD. 42 U.S.C. § 1437f(o); 24 C.F.R. pt. 982. Although funded by the federal government, it is generally administered by state or local government entities known as public housing agencies (PHAs). 24 C.F.R. § 982.1(a). A PHA must comply with HUD regulations and other HUD requirements for the program. 24 C.F.R. § 982.52(a). Federal regulations require PHAs to adopt written administrative plans that establish local policies for administration of the program in accordance with HUD requirements. 24 C.F.R. § 982.54.

The HACC is the local PHA that administers the Section 8 program for Champaign County, Illinois. The HACC Board of Commissioners establishes the policies under which the HACC conducts business. The principal staff member of the HACC is Executive Director Edward Bland. Bland reports to the Board and is responsible for carrying out HACC policies and managing its day-to-day operations. Bland can draft written policies for HACC, but he must take them before the Board for approval. The HACC's administrative plan and local policies are not part of the record in this case.

Eligibility for the Section 8 housing voucher is determined by income. 24 C.F.R. § 982.201. Qualified participants pay a percentage of their income toward rent and utilities and receive subsidies for the balance of the rental payment. 42 U.S.C. § 1437f. The participant's portion of the rent cannot exceed forty percent of his or her monthly adjusted income. 24 C.F.R. § 982.305(a). The

subsidized portion of the rent is paid by the PHA to the rental property owner (the "person . . . with the legal right to lease . . . . a unit to a participant" under the program, 24 C.F.R. § 982.4) pursuant to an HAP contract. Once a PHA determines that a participant is eligible and that there is available space in the program, the PHA issues the participant a voucher and the participant can search for housing. 24 C.F.R. §§ 982.202, 982.302.

If a property owner agrees to lease a unit to a tenant under the program, he must enter into an HAP contract with the PHA. The HAP contract is prescribed by HUD and specifies the maximum monthly rent an owner may charge. 42 U.S.C. § 1437f(c)(1). Before the PHA enters into an HAP contract, the PHA must determine that the cost of the unit is reasonable and meets HUD's prescribed housing quality standards (HQS). 42 U.S.C. § 1437f(o)(8); 24 C.F.R. § 982.305(a); 24 C.F.R. § 982.401. The HAP contract provides that it "shall be interpreted and implemented in accordance with HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982." HUD-52641, Part B (3/2000), ¶ 16(b).

The Section 8 participant enters into a separate lease with the owner that must meet certain requirements pursuant to 42 U.S.C. § 1437f(o)(7). For example, the lease must include the required tenancy addendum. 24 C.F.R. § 982.305(a). The housing must also be inspected annually to ensure that it continues to meet the HQS. 42 U.S.C. § 1437f(o)(8)(B)-(D). Tenants must also re-certify family

income and composition annually to continue in the program. 24 C.F.R. § 982.516.

## B. Factual Background

And now for the details specifically pertinent to this appeal. Khan began participating in the Section 8 program in 1993 through the HACC. Up until 2005 when Khan evicted Andrew Washington, a tenant participating in the Section 8 program, Khan had a seemingly good relationship with the HACC. Khan first began renting to Washington in 2003. The house Khan rented to Washington had a basement that was not part of the subsidized rental unit and could not be rented as living space. Washington asked to rent the basement for storage. Khan testified that he called Nancy Stone-Johnson, an HACC inspector who did the pre-inspection for the unit rented to Washington, and asked if he could rent the basement as a storage unit to Washington under a separate unsubsidized lease. According to Khan, Stone-Johnson said that since the basement was a separate unit and was not part of the subsidized unit, he could rent it as storage. Stone-Johnson testified that she worked for HACC until 2001, but Khan did not rent to Washington until 2003, so she would not have been an employee of HACC at the time. The testimony at trial, however, indicates that she was employed at HACC when Khan contacted her; neither party addressed this inconsistency. In any event, after speaking with Stone-Johnson, we presume as an employee of HACC, Khan entered into a separate unsubsidized lease with Washington for the basement as storage.

Khan then began having problems with Washington as a tenant. He suspected that there were illegal activities going on at the premises and observed that there were inoperable cars and dangerous dogs on the property, smoke detectors and screens that were missing, some windows that were broken, and pests due to uncleanliness. Washington also fell behind on his payment for the storage and apartment leases. Khan sued to evict Washington for late payment of rent and prevailed in December 2005. Around that time, Washington brought the side lease to Bland's attention. Bland called Khan's attorney who brought the eviction action to inform him that Khan was in violation of HUD's rules for entering into a side lease with Washington and that Khan could lose all his Section 8 payments.

A meeting was held between Bland, Khan, and Khan's attorney (a different attorney from the one handling the eviction proceeding) later that month. Bland informed Khan's attorney that he believed Khan was attempting to get more rent than was allowed under the HAP contract and that he did not think the basement was being rented as storage, but instead was used as a way to get around the rent regulations. Bland said that Khan was not the type of person they wanted in the program. Bland informed Khan that he was terminating all of his HAP contracts and that Khan was being debarred from the program. Khan was not given the opportunity to explain his position.

Khan's attorney asked about an appeal process and Bland said, "Well, if he wants to follow that process,

I'll have the Inspector General come in and investigate for fraud." Khan similarly testified that Bland never told him he had a right to a hearing or to an appeal and instead said that "[i]f you do not listen to what I have said, if you ever contest it, I will have you prosecuted criminally." Bland told Khan he had the authority to debar Khan, that he had debarred people before, and that Khan would not be the last person he debarred. Bland testified at trial that an owner can appeal Bland's decisions to the Board and stated that the HACC has a grievance process in place. Nothing in the record describes the process; Bland only testified that a landlord "could write a letter . . . requesting to speak to the Board." As noted, neither Khan nor his attorney were informed of such a process.

On February 10, 2006, Irma Harris, HACC Section 8 Coordinator, sent a letter notifying Khan's Section 8 tenants that Khan's HAP contracts would be terminated effective March 31, 2006, and that they could move to new units effective April 1. On March 28, Khan received a letter from Tosha LeSure (spelled "LeShure" in the pleadings), HACC Section 8 Manager, explaining that the HACC recently sent letters to his tenants informing them that it would be terminating his HAP contracts and that "tenants were also informed that they would need to move from their current units by April 1, 2006." LeSure further explained that the HACC was made aware that moving would cause a hardship for some tenants, so "[f]or those tenants who would face a hardship by moving, the [HACC] will allow them to remain in their **current** units," but that Khan "**MUST**

comply with **all Housing Quality Standards (HQS)** and maintain the units in **habitable** condition." (emphasis in original). LeSure testified that Bland made the decision to terminate Khan's contracts.

Khan retained yet another attorney who scheduled a second meeting with Bland around the end of March. Khan did not attend this second meeting. Bland informed Khan's attorney that he was not going to allow Khan to continue in the program and if Khan "continued to fight this contract termination that he was simply going to go to HUD . . . and report some violations that he alleged existed for Mr. Khan." Khan's attorney tried to find out what violations Bland was referring to, but Bland would not give any specifics. Instead he said that if Khan continued to push the issue, he would seek criminal charges against him, either "through HUD or the federal level" (presumably through other federal authorities).

At this time, Khan had four Section 8 tenants: Eddie Jackson, Caroline Hill, Carol Dorsey, and Melody Decker. Testimony at trial revealed that Dorsey and Hill were allowed to stay in Khan's units, his HAP contracts for those tenants were not terminated, and he continued to receive Section 8 payments for them. Khan's HAP contract for the Jackson rental was terminated pursuant to the February 2006 letter; Jackson moved out on April 1. Khan's HAP contract for the Decker rental was terminated, according to the appellees, but disputed by Khan, for failing to pass the annual HQS inspection.

Khan and Decker received a letter from HACC on January 27, 2006, informing them that the annual HQS

inspection was scheduled for February 13. The Decker unit failed the first inspection and a second inspection was scheduled for March 13. After the unit purportedly failed the second inspection, the HACC sent Khan a letter dated March 15 informing him that as of April 1, the contract would be terminated for failure to correct noted deficiencies and Decker would be allowed to move immediately. Decker moved from the property but testified that she wanted to stay.

Khan testified that the inspection of the Decker rental was done differently than the ones previously done by the HACC. He stated that his contractor fixed everything on the list from the February inspection and that during the March inspection, the HACC only noted minor repairs that were needed, such as a loose toilet base and two inoperable electrical outlets. Until this point, Khan never had a property that was terminated for failing an inspection. The year before, rent for the same property was going to be abated (meaning no HAP payments until repairs are made), but Khan fixed the problem before abatement. There was one other instance where Khan received a letter from HACC stating that he had to do emergency repairs on one of his units or his HAP payments would be abated. Although not clear from the testimony, it appears that this issue was resolved without abatement.

Monique Hassan, a prospective Section 8 tenant, testified that she had a voucher for Section 8 housing and wanted to rent from Khan around the end of 2006. She spoke with Pam Presley, HACC Section 8 Co-

ordinator, about renting the property. Presley told her that Khan was an "undesired person," that he wasn't good to rent from, and she could not rent from him. Hassan informed Khan of her conversation with Presley and found another unit to rent.

## II.

Khan alleges that Bland and the HACC violated his procedural and substantive due process rights under the Fourteenth Amendment. He asserts that he had property rights in his existing HAP contracts and his expectancy to contract in the future and that Bland and HACC terminated his contracts and debarred him from the program without due process. Khan also alleges that the termination of his contracts, debarment from the program, and Presley's statement to Hassan that he was undesirable and unfit for the program constituted a deprivation of his liberty interest. He further alleges that his substantive due process rights were violated when Bland debarred him from the Section 8 program arbitrarily and capriciously with malice in retaliation for evicting a tenant. These theories are discussed below.

### A. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment forbids a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "An essential component of a pro-

cedural due process claim is a protected property or liberty interest." *Minch v. City of Chi.*, 486 F.3d 294, 302 (7th Cir. 2007). "If the plaintiffs can establish such a loss, we then must determine what process was due regarding that loss." *Belcher v. Norton*, 497 F.3d 742, 750 (7th Cir. 2007).

### 1. Property Interest

To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Hudson v. City of Chi.*, 374 F.3d 554, 559 (7th Cir. 2004) (citation omitted). Accordingly, a plaintiff asserting a procedural due process claim must have a protected property interest in that which he claims to have been denied without due process. *Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007). Khan has no protected property interest in future HAP contracts with HACC, so his procedural due process claim on that basis fails. Assuming Khan has a protected property interest in his existing HAP contracts, his due process rights were satisfied by his ability to bring a state law breach of contract action to remedy any alleged violations.

To claim a property interest protected by the Fourteenth Amendment, "a person . . . must have more than a unilateral expectation of [the claimed interest]. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "A legitimate claim of entitlement to warrant a due process

hearing occurs only when the statutes [or] regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing." *Fincher v. South Bend Heritage Found.*, 606 F.3d 331, 334 (7th Cir. 2010) (internal quotations and citations omitted). "A property interest of constitutional magnitude exists only when the state's discretion is 'clearly limited' such that the plaintiff cannot be denied the interest 'unless specific conditions are met.'" *Brown v. City of Michigan City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006) (internal quotations and citation omitted).

Using these guideposts, we have held that participants who have been issued a certification for rent assistance have a property interest in the assistance and must be heard before being expelled from the program, *Simmons v. Drew*, 716 F.2d 1160, 1162 (7th Cir. 1983), but Section 8 housing applicants who have been deemed eligible do not have a protected right that entitles them to due process when they are denied a specific Section 8 housing unit because landlords have considerable discretion in making final tenancy decisions, *Fincher*, 606 F.3d at 333-34. The issue here is whether under relevant statutes, regulations, rules, policies or contracts, Khan— a Section 8 landlord, rather than a tenant—has a legitimate claim of entitlement to continue his existing HAP contracts and enter into future contracts.

We begin our analysis with Khan's claim of debarment. Khan argues that Bland debarred him from the Section 8 program so he could not enter into future HAP contracts

or participate in any government programs, including research grants. The record contains no evidence that Khan was actually debarred from other federal programs or was denied any research grants. Debarment is a sanction that excludes an individual from conducting business with any federal agency government-wide. *See* 2 C.F.R. pt. 180 (explaining debarment process as conducted by federal agency); *see also* 2 C.F.R. pt. 2424 (formerly 24 C.F.R. pt. 24) (HUD debarment procedure). Arthur Orton, Director of Compliance for the Departmental Enforcement Center for HUD, attested (through an affidavit admitted at trial) that Khan was never debarred by HUD.

Further, Bland, despite his threatening statements, did not have authority to officially debar Khan from participation in federal programs. In fact, Khan continued to participate in the Section 8 program through the HACC with respect to two of his properties. If Khan was officially debarred, suspended, or denied participation in a HUD program, the regulations set forth procedures for contesting the imposed sanction. *See, e.g.*, 2 C.F.R. § 2424.1130 (formerly 24 C.F.R. § 24.1130) (procedures for contesting a limited denial of participation from HUD program). Khan did not contact HUD to determine whether he was officially debarred, nor does he argue on appeal that the procedures set forth in the applicable regulations should have been followed. This is probably because the regulations apply to debarment by HUD and as noted, Khan was not debarred by HUD and so, was not denied participation in other government programs.

Bland, however, effectively debarred Khan from the Section 8 program administered in Champaign County by declining to enter into new contracts with him. So we consider whether Khan had a property interest in his expectancy to enter into new HAP contracts. To establish such a property interest, Khan must show that he has an entitlement to participate through regulations, rules or understandings, such that if certain substantive predicates are met, a particular outcome necessarily follows. *See Kim Const. Co., Inc. v. Bd. of Trs. of Vill. of Mundelein*, 14 F.3d 1243, 1246-48 (7th Cir. 1994) (finding that a disappointed bidder had no property interest in a contract for a municipal sewer project even though he was the low bidder where the relevant statute and regulations gave the municipality the right to reject any and all bids); *see also Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (stating that a person's interest in a benefit is "property" under the Fourteenth Amendment "if there are such rules or mutually explicit understandings that support [a] claim of entitlement" that may be invoked at a hearing).

Khan has not shown that the relevant regulations established eligibility criteria that, if satisfied, entitled him to participation in the Section 8 program. The regulations prescribe seven reasons why a PHA may, in its administrative discretion, disapprove an owner and deny the owner a lease under the program, including an owner's violation of his obligations under an HAP contract. 24 C.F.R. § 982.306(c)(1)-(7). That section also plainly states that "**[n]othing in this rule is intended to give any owner any right to participate in the program**." 24 C.F.R. § 982.306(e) (emphasis added). When issuing

final implementing regulations in 1999, HUD responded to a public comment suggesting an appeal process for owners prohibited from participating in Section 8. HUD stated: "Owners have no statutory or regulatory right to participate in the housing choice voucher program, and consequently have no due process right to a hearing on a PHA's decision to disapprove owner participation. There is no federal mandate for PHAs or HUD to grant owners a process for appeal of a PHA decision to disapprove owner participation." Section 8 Tenant-Based Assistance, 64 Fed. Reg. 56,894, 56,901 (Oct. 21, 1999). In dicta, the Fifth Circuit has noted: "Congress plainly expressed its intent to provide housing assistance for the benefit of the low-income families participating in the program; it would be absurd to treat the voucher program as a landlords' relief act!" *Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 363 (5th Cir. 2006).

Khan has not pointed to any provision of the contract, federal law, or state law that would entitle him to continued participation in the Section 8 program beyond performance of his existing contracts. The regulations themselves state that owners are not entitled to participation. *Compare Talley v. Lane*, 13 F.3d 1031, 1035 (7th Cir. 1994) (finding that applicant for subsidized housing program for the disabled had no constitutionally protected property interest in the program where housing authority had discretion to establish tenant selection criteria and to determine that applicant was undesirable because of his extensive criminal record), *with Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990) (finding that plaintiff had property interest as a

vocational school to participate in the federal student financial aid program under the Higher Education Act for the benefit of its students because the eligibility standards in the Act provided "the sort of 'substantive predicate' the courts have required before finding that property interests exist." (citations omitted)), *and Easter House v. Felder*, 910 F.2d 1387, 1395 (7th Cir. 1990) (en banc) (finding that statutory and regulatory limitations upon the Illinois Department of Children and Family Services' authority to deny license renewals to child welfare agencies created a legitimate claim of entitlement and thus, a property interest). Because Khan is not afforded a substantive right to participate in the program, he is not afforded procedural due process rights upon denial.

Khan may, however, have a property right in his existing contracts with HACC. *See Mid-Am. Waste Sys., Inc. v. City of Gary, Ind.*, 49 F.3d 286, 290 (7th Cir. 1995) ("If a contract creates rights specific enough to be enforced in state court by awards of damages or specific performance, then it creates a legitimate claim of entitlement; and if it creates such a claim, it is 'property.'"). This right appears to include the continuation of these contracts beyond a twelve-month term. The HAP contract states that "[t]he term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (*including the initial lease term and any extensions*)." HUD-52641, Part B (3/2000), ¶ 4(a) (emphasis added); *see also* 24 C.F.R. § 982.451(a)(2) ("The term of the HAP contract is the same as the term of the lease."). Jackson's lease stated that "[t]his lease is for one year and extends automatically for another year

after that unless terminated by either party at one month notice before the end of the year." Pl's Ex. 21. Decker's lease provided that "[t]his lease agreement extend[s] automatically for another year if not terminated by either side before the expiration of the current lease by . . . certified mail." Pl's Ex. 25.

Although the defendants presented evidence that the initial lease terms typed on the front of the HAP contracts were for twelve months, the term of the HAP contract includes the initial lease term *and any extensions*. While the applicant must undergo re-certification and the rental unit must pass an HQS inspection annually to continue the HAP contract, if those conditions are met, the term of the HAP contract, by its express provisions, includes any extensions of the lease. Further, LeSure testified that a landlord could expect that as long as he complied with HQS inspections and cooperated with the annual re-certification process, the HAP contract would renew. The HACC, however, can terminate HAP contracts if it determines that the unit does not meet all requirements of the HQS, or if the owner has otherwise breached the contract. HUD-52641, Part B, ¶¶ 4(b)(8), 10(a) and (c).

Whether Khan's existing HAP contracts were wrongfully terminated requires an evaluation of the terms of the contract and incorporated federal regulations. The HAP lists actions by the owner that constitute a breach, including:

> (1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program. . . .

HUD-52641, Part B, ¶ 10(a); *see also* 24 C.F.R. § 982.453. When the HACC determines that a breach has occurred, it "shall notify the owner of such determination, including a brief statement of the reasons for the determination." HUD-52641, Part B, ¶ 10(b). Any notice must be in writing. HUD-52641, Part B, ¶ 15.

Bland testified that he is authorized to terminate HAP contracts when he believes the owner has violated the terms of the agreement. He terminated the HAP contract for the Decker rental because of alleged HQS failures. He terminated the Jackson rental because of Khan's alleged violation of his HAP contract on the Washington unit, but did not provide Khan with the required written notice. Khan contends that the HAP contract on the Decker rental should not have been terminated for such minor HQS violations that Khan was ready, able, and willing to fix. Khan testified that he repaired the items noted from the February inspection and the March inspection only revealed minor items that he could have fixed; yet, the HACC terminated his contract. The regulations, however, provide that the owner must maintain the unit in accordance with HQS and if he fails to do so, the housing authority "must take prompt and vigorous action to enforce the owner obligations," such as

"termination of the HAP contract." 24 C.F.R. § 982.404(a)(1) and (2); *see also* 24 C.F.R. § 982.452(b)(2) (stating that the owner is responsible for "[m]aintaining the unit in accordance with HQS, including performance of ordinary and extraordinary maintenance").

Even assuming the HAP contract for Decker was properly terminated for HQS violations, Khan contends that the HAP contract for Jackson should not have been terminated. If, however, Khan violated the HAP contract on the Washington rental by entering into a side lease for storage space, then the HACC could terminate his other HAP contracts pursuant to HUD-52641, Part B, ¶ 10(a)(2). At trial, the parties disputed whether the side lease was a violation of the HAP contract.

Under the HAP contract, the owner certifies that "[e]xcept for the rent to owner, the owner has not received and will not receive any payments or other consideration . . . for rental of the *contract unit* during the HAP contract term." HUD-52641, Part B, ¶ 8(d) (emphasis added); *see also* 24 C.F.R. § 982.451(b)(4)(i) and (ii) ("The part of the rent to owner which is paid by the tenant may not be more than: (A) The rent to owner; minus (B) The PHA housing assistance payment to the owner" and "[t]he owner may not demand or accept any rent payment from the tenant in excess of this maximum . . . ."); *see also* HUD-52641, Part C, ¶ 5(e) ("The owner may not charge or accept, from the family or from any other source, any payment for rent of the *unit* in addition to the rent to owner.") (emphasis added). The rent includes "all housing services, maintenance, utilities and

appliances to be provided and paid by the owner in accordance with the lease" and the "owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality." HUD-52641, Part C, ¶ 5(e) and (6)(c); *see also* 24 C.F.R. § 982.510(c).

The tenancy addendum further states that "if the tenant and the owner agree to any . . . changes in the lease, such changes must be in writing, and the owner must immediately give the [HACC] a copy of such changes." HUD-52641, Part C, ¶ 15(a). Any changes "must be in accordance with the requirements of the tenancy addendum." HUD-52641, Part C, ¶ 15(a). "The owner must notify the [HACC] of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the *unit* as most recently determined or redetermined by the [HACC] . . . ." HUD-52641, Part C, ¶ 15(d) (emphasis added).

Khan contends that he did not violate these provisions because he was renting a different unit, not for housing, but for storage. He points to the definition of "[c]ontract unit" under the HAP: "The housing unit rented by the tenant with assistance under the program." HUD-52641, Part C, ¶ 17. Because the storage space was not part of the housing unit rented under the program, Khan asserts that his side lease did not violate the HAP. He further asserts that Stone-Johnson, HACC inspector, confirmed that he could enter into the side lease.

However, we need not decide whether the side lease was a breach of the HAP contract because Khan could

have asserted his rights under the contract through a breach of contract action. Due process does not necessarily require that Khan be given a predeprivation hearing where there is no present entitlement and the issue is an ordinary state law claim of breach of contract by a public body. Where a "postdeprivation hearing not only is feasible but will give the deprived individual a completely adequate remedy" due process does not necessarily require a predeprivation hearing. *See, e.g., Chi. United Indus., Ltd. v. City of Chi.*, 445 F.3d 940, 944 (7th Cir. 2006) (quoting *Ellis v. Sheahan*, 412 F.3d 754, 758 (7th Cir. 2005)). "[T]he adequacy of litigation as a means to determine the meaning of a contract is a premise of our legal system." *Id.* (quoting *Mid-Am. Waste Sys.*, 49 F.3d at 291); *see also Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004) ("All states provide judicial remedies for breach of contract and these remedies will almost always provide all the process that is constitutionally due.").

In *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 191 (2001), the California Labor Code authorized the state of California to withhold payments due a contractor on a public works project if a subcontractor failed to comply with certain Code requirements and in turn, permitted the contractor to withhold those sums from the subcontractor. An unpaid subcontractor brought suit under the Due Process Clause of the Fourteenth Amendment because the statutory scheme did not afford it a hearing before or after the sums were withheld. *Id.* The Supreme Court assumed without deciding that the subcontractor had a property interest

in payment, but held that California law afforded the subcontractor sufficient opportunity to pursue that claim in state court. *Id.* at 195. The Court distinguished this case from others where a reasonably prompt hearing was required because in such cases, "the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Id.* at 196. The Court reasoned that "[u]nlike those claimants, [the subcontractor] ha[d] not been denied any present entitlement." *Id.* Rather, the subcontractor had been denied payment under a contract based on the state's determination that it failed to comply with the contract's terms. *Id.* Accordingly, the subcontractor's interest could be protected by an ordinary contract suit. *Id.*

Similarly, Khan has not been deprived a present entitlement, but rather, monies owed under his HAP contracts and lease agreements. His rights under the HAP contracts can be fully protected by bringing a breach of contract action. A postdeprivation process is appropriate in this case because Khan is not being deprived of his ability to rent housing to other tenants, only his ability to rent under the program. He can still pursue his occupation as a landlord; his need to remedy the deprivation is not particularly time sensitive. *See, e.g.*, *DeBoer v. Pennington*, 287 F.3d 748, 750 (9th Cir. 2002) (applying *Lujan*'s holding to the property interest of former managers of a city-owned cemetery whose management contract was terminated by the city and reasoning that because the "contract here has not given rise to a greater interest than the contract itself," the deprivation was

a mere contractual injury that could be adequately protected by a state breach of contract suit); *cf. Baird v. Bd. of Educ. for Warren Cmty. Unit*, 389 F.3d 685, 691-92 (7th Cir. 2004) (distinguishing *Lujan* because a state law breach of contract action is not an adequate remedy for a terminated employee who possesses a present entitlement and who has been afforded only a limited pretermination hearing; it does not satisfy the requirement of promptness, which is essential for employees to pursue remedies such as reinstatement).

The dispute here involves the interpretation and application of the parties' contractual relationship. The due process clause does not "require hearings to resolve disputes about the meaning and effect of laws, regulations, and contracts." *Goros v. Cnty. of Cook*, 489 F.3d 857, 859-60 (7th Cir. 2007). "[U]nless the plaintiff maintains that the state actor had to offer a hearing to resolve some contested issue of fact, the dispute belongs in state court under state law." *Id.* at 860. Khan is contending that his contracts should not have been terminated for his failure to remedy minor HQS violations or for entering into a side lease agreement with Washington for storage when he was given approval by Stone-Johnson. These issues will ultimately be resolved by reviewing the contract terms, the incorporated regulations, and the parties' understanding under the contract. Khan is seeking to enforce the HAP contract substantively against the HACC and such action cannot be maintained in federal court under the due process clause. *See, e.g., Kay v. Bd. of Educ. of City of Chi.*, 547 F.3d 736, 739 (7th Cir. 2008).

Khan contends that because Bland's conduct was not random and unauthorized, a predeprivation hearing is required, but "[i]n a variety of cases not limited to ones in which the seizure is random and unauthorized, predeprivation process has not been required." *Ellis*, 412 F.3d at 758 (citations omitted); *see also Mid-Am. Waste Sys.*, 49 F.3d at 291 (ruling not to invoke principle in *Parratt v. Taylor*, 451 U.S. 527 (1981) that deals with situations where state actors ought to provide some kind of hearing before acting, but mistake or other happenstance intervenes; in contrast, "when the issue is the meaning of a commercial contract, a prior hearing is *unnecessary*, and the opportunity to litigate in state court is all the process 'due' to determine whether the state has kept its promise."). Khan could have asserted a claim for breach of contract, but he declined the district court's invitation to amend his complaint to do so. Khan's claim that he was denied due process upon deprivation of his property rights must therefore fail.

### 2. Liberty Interest

On appeal, Khan also argues that the termination of his HAP contracts, debarment from the program, and Presley's statement that he was undesirable and unfit for the program constitute a deprivation of his liberty interests without due process of law. Khan, however, did not allege a claim for deprivation of *liberty* interest in the complaint or in response to the motion for judgment as a matter of law. Khan did address stigma as it related to substantive due process, but not procedural

due process. He has therefore forfeited this claim. *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008) (a claim not raised below is forfeited).

In any event, even if not forfeited, his claim fails. This court addressed a similar argument in *Medley v. City of Milwaukee*, 969 F.2d 312 (7th Cir. 1992). In that case, the Medleys contracted with the Housing Authority of the City of Milwaukee to rent units to persons participating in the federally-funded rent assistance program. *Id.* at 313. The Medleys requested that a tenant pay extra for parking space (even though the tenant did not have a car) without seeking the housing authority's approval. The Medleys eventually initiated eviction proceedings against the tenant for nonpayment of rent. During the proceedings, the state judge found that the Medleys had violated the terms of their HAP contract because the housing authority had not approved the extra rent payments. *Id.* at 314-15. As a result of the violation, the housing authority barred the Medleys from future participation in the rental program. *Id.* at 315. One of the issues on appeal was whether the Medleys had a liberty interest in participating in the program. *Id.* at 316. We found they did not.

The Medleys argued that their debarment from participation in the program deprived them of a liberty interest because they were accused of illegally collecting rental monies above and beyond the amounts set forth in the approved leases. *Id.* at 317. They argued that they were deprived of this liberty interest without due process of law when they were debarred without

prior notice or a hearing. *Id.* We initially noted that "there is a liberty interest in not being barred from bidding on government contracts or seeking governmental employment when the basis for the bar is a charge of misconduct which in turn affects the reputation of the person or entity involved, and the bar may substantially affect future employment or contracting opportunities." *Id.* (citations omitted).

We, however, addressed several problems with the Medley's argument as it applied to the Section 8 program. First, the Medleys were not bidding on a government contract or seeking government employment and they could cite no case where a court has found a liberty interest in a private party's participation in a government assistance program designed to provide benefits for a third party. *Id.* at 317. Further, their debarment did not foreclose the opportunity to contract with any local or state housing assistance programs or to lease their units to persons who were not in the program. *Id.* at 317-18. At the time the housing authority decided not to renew the Medleys' contracts, only four of their units were leased to program participants. *Id.* The Medleys' debarment, therefore, "did not 'effectively put [them] out of business.'" *Id.* (quoting *Old Dominion Dairy Products, Inc. v. Sec'y of Def.*, 631 F.2d 953, 963 (D.C. Cir. 1980)). The Medleys also provided no explanation how the actions of the defendants damaged their reputations. *Id.* "In order to possess a liberty interest in a debarment case, the plaintiff must demonstrate that his 'good name, reputation, honor or integrity is at stake because of what the government is doing to

him.'" *Id.* (quoting in part *Bd. of Regents*, 408 U.S. at 573). There was no allegation that the defendants published the reason for the debarment to any one other than the Medleys. Accordingly, the court found that the Medleys had no liberty interest in continued participation in the program. *Id.*

Similar to *Medley*, Khan was not barred from renting his units and could continue his occupation as landlord; thus, he was not put out of business by Bland's actions. He similarly failed to show that he has a liberty interest to participate in a government assistance program designed to provide benefits for third parties. Unlike *Medley* though, there is evidence that Presley, an HACC employee, told Hassan, a prospective Section 8 tenant, that Khan was an "undesired person" and "wasn't a good person to rent [from]." However, even if these allegedly defamatory statements were made at the direction of Bland, "mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes serious impairment of one's future employment," *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (internal quotation marks, brackets and citation omitted); *see also Paul v. Davis*, 424 U.S. 693, 697, 708-09 (1976). Rather, it is the "alteration of legal status," such as the governmental deprivation of a right securely held, "which, combined with the injury resulting from the defamation, [that] justifie[s] the invocation of procedural safeguards." *Paul*, 424 U.S. at 708-09; *see also Brown v. City of Mich. City, Ind.*, 462 F.3d 720, 730 (7th Cir. 2006). This is known as the "stigma plus" test, and Khan cannot fulfill the "plus" factor.

This court recognizes a valid liberty interest when "[an] employee's good name, reputation, honor or integrity [is] called into question in a manner that ma[kes] it virtually impossible for the employee to find new employment in his chosen field." *Brown*, 462 F.3d at 730 (quoting *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001)); *see also Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010) (holding no liberty interest where even though the plaintiff feared that he would not be employed at additional health care institutions in the future, "it is the liberty to pursue a *calling or occupation*, and not the right to a specific job, that is secured by the Fourteenth Amendment." (emphasis added) (quotation marks, brackets and citation omitted)). No lesser showing would be sufficient under the circumstances of this case.

There is a lack of evidence that Khan was precluded from pursuing his chosen occupation because of the appellees' actions. He could still rent to non-Section 8 housing tenants and participate in other state or government assistance programs. Although Khan contends he was debarred from other government programs, the undisputed evidence shows that he was not officially debarred. Accordingly, Khan cannot establish a liberty interest in continued participation in the Section 8 program through the HACC.

## B.  Substantive Due Process

Khan contends that the appellees' debarment of him from further participation in the Section 8 program was

arbitrary and capricious and done with malice in retaliation for his eviction of Washington. As such, he contends the debarment was a violation of his substantive due process rights and no adequate state law remedy exists.

"Intrusion upon a cognizable property interest is a threshold prerequisite to a substantive due process claim." *Gen. Auto Serv. Station v. City of Chi.*, 526 F.3d 991, 1002 (7th Cir. 2008) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"). "[T]he lack of a protected property interest is fatal to a substantive due process claim." *Id.* As set forth above, Khan has not established a property or liberty interest in his expectancy to enter into new HAP contracts and therefore, his debarment from the program cannot be a basis for his substantive due process claim.

Khan's potential breach of contract action also cannot support his substantive due process claim. No fundamental rights are implicated by the alleged breach. "There are only a handful of fundamental rights for which the due process clause has a substantive component," *Taake v. Cnty. of Monroe*, 530 F.3d 538, 542 (7th Cir. 2008) (internal quotations and brackets omitted) (quoting *Goros v. Cnty. of Cook*, 489 F.3d 857, 860 (7th Cir. 2007)), and courts must be reluctant to expand substantive due process rights "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, *Tex.*, 503 U.S. 115, 125 (1992). Fundamental rights are rights "deeply rooted

in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and quotations omitted).

"[M]ere breaches of contract by the government do not support substantive due process claims under the Constitution." *Taake*, 530 F.3d at 542. "[A] unit of state or local government does not violate the federal Constitution just because it violates . . . the law of contracts." *Garcia v. Kankakee Cnty. Hous. Auth.*, 279 F.3d 532, 535 (7th Cir. 2002) (citations omitted). "If a state's violation of its own laws and regulations does not violate the due process clause, it is hard to see how failure to keep a promise contained in a contract can violate the due process clause." *Mid-Am. Waste Sys. Inc.*, 49 F.3d at 290.

Khan is seeking the right to a government subsidy; this is not a fundamental right protected by substantive due process. *See, e.g., Glucksberg*, 521 U.S. at 722 (stating that the development of the Court's substantive-due-process jurisprudence has "been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition."); *see also Idris v. City of Chi.*, 552 F.3d 564 (7th Cir. 2009) ("*Glucksberg* and the [Supreme] Court's other opinions are adamant: only state action that impinges fundamental rights is subject to evaluation under substantive due process."). Khan's remedy lies in a breach of contract action, not a federal substantive due process claim. *See Khan v. Gallitano*, 180 F.3d 829, 835 (7th Cir. 1999) (finding no

due process claim where the plaintiff failed to show why the right to be free from tortious interference by state actors is a fundamental right deeply rooted in our history and tradition or implicit in the concept of ordered liberty or why a state law remedy is inadequate under the federal constitution).

Khan also has not shown that there was a violation of some other substantive constitutional right or that available state law remedies are inadequate. *See Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) (stating that substantive due process claim is limited to fundamental rights and wrongful termination of public employment is not actionable as a violation of substantive due process unless the employee also alleges the defendant violated some other constitutional right or state remedies were inadequate). Nor has Khan shown that the Bland's actions rose to the level of shocking the conscience. "Official misconduct will rise to the level of a constitutional violation only if it shocks the conscience." *Palka*, 623 F.3d at 454; *see also Khan v. Gallitano*, 180 F.3d 829 (7th Cir. 1999) (discussing applicability of "shocks the conscience" standard). Khan's substantive due process claim, therefore, fails.

Accordingly, for the reasons stated, the judgment of the district court is AFFIRMED.